UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

A.M.

     Plaintiff,

v.

EXCEL HOSPITALITY, LLC,
SAJAAD CHAUDRY, and
JOHN DOES 1-5,

     Defendants.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff files her Complaint and shows the Court as follows:

## Introduction

1.

When A.M. was 15 years old, she was a victim of child sex trafficking at the Motel 6 located at 6015 Oakbrook Parkway, Norcross, GA 30093. For approximately two months beginning in or around September 2013 and continuing through approximately November 2013, A.M. was repeatedly sold for sex by a trafficker at the Motel 6. The Motel 6 was notorious for sex trafficking and other criminal activity. Defendants negligently and recklessly permitted and profited from sex trafficking, drug dealing, and violent crime that occurred at the Motel. As set forth herein, Defendants are liable to Plaintiff for damages arising from the crimes and harms committed against her. Given the nature of the case, Plaintiff

1

is identified in this Complaint by her initials. Plaintiff's counsel will disclose her full name to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.[1]

2.

Defendant Excel Hospitality, LLC (hereinafter referred to as the "LLC", the "Defendant" or the "Motel") is a Georgia limited liability company. The LLC was administratively dissolved by the Georgia Secretary of State on September 8, 2023. However, pursuant to O.C.G.A. § 14-11-603(b)(3) "[a] limited liability company administratively dissolved continues its existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs." Additionally, pursuant to O.C.G.A. § 14-11-603(b)(3) "[t]he administrative dissolution of a limited liability company does not terminate the authority of its registered agent." The registered agent for the LLC is Sajaad Chaudry, who may be served at 3301 Keenland Road, Marietta, GA 30062.

3.

Pursuant to O.C.G.A. § 14-11-605, to the extent a dissolved limited liability company does not discharge, make provision to discharge, or dispose of a claim

---

[1] Plaintiff will be filing a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include the sex trafficking of A.M. Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

against it, such claim may be enforced against the limited liability company, to the extent of its undistributed assets, or against each member receiving a distribution in winding up, to the extent of the assets so distributed to such member. Here, Plaintiff believes and contends that Sajaad Chaudry is a member of the LLC, and the identity of any other members of the LLC, if any, are currently unknown to Plaintiff, so Plaintiff has used pseudonyms John Does 1-5 as placeholders for the other individual members of the LLC, and once Plaintiff learns the true identities of such members, Plaintiff will amend this Complaint to substitute the true identities of such members in place of the pseudonyms John Does 1-5.

4.

At all times relevant herein, Defendants owned, operated, maintained, controlled, managed, and/or were responsible for securing the Motel located at 6015 Oakbrook Pkwy, Norcross, Georgia 30093, from which Defendants benefited financially.

5.

Defendants knew or should have known of the rampant sex trafficking and prostitution at the Motel for years, before, during, and after Plaintiff's trafficking. Defendant knew or should have known, among other reasons, because:

    a.    Underage victims of sex trafficking, including A.M., were forced to stand outside their motel rooms openly displayed on the balcony

and/or walk around the Motel property or street in front of the Motel in revealing clothing (including high heels, short shorts, and crop tops, as an example), while being watched by their sex traffickers, until the girls were approached by men who would negotiate to buy the girls and them take them into the motel rooms to have sex with them;

b. Sex buyers would frequently drive into the motel's parking lot to look at all the different young girls and women being sold for sex who were standing on the balcony or walking around the property. The buyers would then select the girl they wanted to purchase and the buyers would then hand over money to the victims and/or their traffickers and proceed to enter motel rooms for short periods of time to have sex with the victims. After having sex with the victims, the buyers would get in their cars and leave;

c. The above pattern of activity occurred repeatedly in open sight at the Motel each day, throughout the day;

d. There were also lookouts at the property who would stand watch on the corner of the Motel and these lookouts would coordinate with the girls being sold, the traffickers, and the Motel management;

e. On average, Plaintiff A.M. would be sold to approximately 5 – 7

different buyers per day;

f.   A.M frequently interacted with the Motel's staff who knew or should have known she was obviously being sold for sex.  Among other things, the Motel staff would bring A.M. additional towels on a daily basis, which is a known sign that a victim is having to shower multiple times per day after being sold for sex.  Also, on several occasions A.M. went to the front desk herself to ask for additional towels or soap for her frequent showering needs. Additionally, the staff would come into the room and take out the trash each day, and in the clear trash bags, multiple used condoms would be visible each day in the 15-year old's room;

g.   A.M.'s trafficker had a close friendly relationship with the Motel manager, and this manager coordinated and allowed the trafficking to continue;

h.   Defendant and/or his employees rented rooms at the Motel to sex traffickers and drug dealers on an ongoing basis, in some instances for many weeks or months at a time;

i.   Defendants knew or should have known of rampant sex trafficking generally in the Oakbrook Parkway area where the Motel was located, and Defendants knew or should have known of the rampant

sex trafficking at the Motel specifically.

6.

Despite all of the above knowledge, Defendants negligently and recklessly failed to take appropriate and reasonable measures to prevent sex trafficking from occurring at his motel, including Plaintiff's sex trafficking in particular, and instead actively took steps to allow the trafficking to continue.

7.

At all times relevant to this Complaint, A.M. was a minor child victim of sex trafficking at Defendants' Motel.

8.

Sex trafficking and prostitution were common occurrences at the Motel and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the motel. Defendants are liable to Plaintiff for the Motel's employees and agents' actions and failures to act. Defendants' liability to Plaintiff is straightforward:

a. The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person ***knew or should have known*** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant

6

Motel  knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the motel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Plaintiff's trafficker so Plaintiff could be sold for sex at the motel, and (ii) did so despite what Defendant knew or should have known about Plaintiff being a victim of sex trafficking at the motel. As a result of Defendant and/or his employees or agents' conduct, Plaintiff suffered physical and mental harms, and Defendant is liable to Plaintiff for the damages arising from those harms under the TVPRA. Additionally, because Plaintiff was a child when she was trafficked at the Motel, Masha's Law, 18 U.S.C. § 2255, provides an avenue to pursue a civil remedy for the substantive violation of 18 U.S.C. § 1591, with the same substantive analysis under the § 1595 claim above; and

b.  The Motel constituted a public nuisance under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at the Motel, causing her special damages.

7

9.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct personally or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Motel.

10.

Further, a person under the age of 18 cannot consent to having sex in exchange for money under any circumstance. Any sale of sex in exchange for money involving a person under eighteen (i.e., "minor sex trafficking") is *criminal* sex trafficking under federal law. 18 U.S.C. § 1591(a). Minor sex trafficking does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a)(1), *et seq.* Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1). Still, Plaintiff A.M. was repeatedly sold for sex at the Motel, and despite such crimes obviously occurring, Defendant failed to intervene in any way to report or stop such crimes.

11.

Plaintiff brings this suit against Defendants to recover for the physical, emotional, and mental harm caused by her sexual exploitation at the Motel, which was permitted to occur as a direct and proximate result of Defendants' negligent,

reckless, and willful failures to prevent prostitution, crime, violence, and sex trafficking from occurring at his Motel.

## Parties, Jurisdiction, and Venue

12.

A.M. was born in 1998 and was a minor at the time of her sex trafficking alleged herein.

13.

At all times relevant to this Complaint, Defendants owned, managed, supervised, operated, oversaw, controlled the operation of, and rented rooms at the Motel, from which Defendants benefited financially.

14.

Defendant Chaudry is a resident of the State of Georgia and resides at 3301 Keenland Road, Marietta, GA 30062, where service can be made upon him. Defendant Chuadry is also the registered agent for the Motel, and the Motel can be served through Defendant Chaudry at the same address.

15.

Jurisdiction and venue are proper as to Defendants, and Defendants were properly served with process in this action.

**Plaintiff A.M.'s Sex Trafficking at the Motel**

16.

While she was 15 years old, A.M. was sex trafficked at the Motel for approximately two months from around September 2013 through late November 2013.

17.

A.M.'s sex trafficker sold A.M. to approximately 5-7 different buyers per day.

18.

While at the Motel, A.M.'s sex trafficking occurred openly and obviously and was observed by the Motel employees, who also participated with the trafficker in allowing the trafficking to continue.

19.

A.M. was required to stand on open display on the Motel's balcony and/or walk the property in or around the Motel dressed in tiny revealing clothing so that men would approach her and buy her for sex.

20.

During the time A.M. was being trafficked for sex, Motel employees lived at the Motel themselves or, at minimum, staffed the motel 24 hours per day / 7 days per week, and thus, Defendant and/or the other motel employees could see the sex-trafficking activity that was occurring openly and publicly on its property.

21.

Motel employees frequently saw Plaintiff A.M., her trafficker, and the other sex traffickers and sex trafficking victims at the motel.

22.

Defendant and/or the other motel employees had friendly, close personal relationships with traffickers at the motel, including Plaintiff A.M.'s trafficker, and thus would participate and allow the trafficking to continue without interruption.

23.

While Plaintiff A.M. was trafficked for sex at the Motel, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant and the other motel employees knew or should have known. These included Plaintiff's young age and inappropriate dress, Plaintiff being required to openly stand in front of the motel to be approached by adult male strangers who would then accompany Plaintiff into her motel room for short periods of time, and Plaintiff's monitoring and control by her trafficker.

24.

Plaintiff's sex trafficker operated openly and brazenly at the Motel, as did other sex traffickers. In addition to Plaintiff A.M.'s trafficking, there were numerous other sex trafficking victims at the motel at any given time and numerous other traffickers controlling those girls at the motel.

25.

Due to the high number of victims being sold for sex at the motel, a large number of buyers frequented the motel each day. Defendant knew or should have known that this was an indication of sex trafficking, and minor sex trafficking, at the motel.

26.

Defendant knew or should have known that the Motel served as an open market for sex, including with victim A.M., based on all of the obvious activity that would occur in the open and public areas on Defendant's motel property.

27.

A.M. was finally only able to escape her sex trafficker when he left her alone for over an hour and she ran away from the Motel.

**Defendant's Knowledge of Prior Crime and Sex Trafficking at the Motel**

28.

For many years prior to Plaintiff's trafficking, the Motel was rampant with other instances of sex trafficking, prostitution, crimes against women, dangerous illegal activity, drugs, and violence.

29.

Before and during Plaintiff's sex trafficking at the Motel, Defendants and other Motel employees knew or should have known about the crime, including specifically the sex trafficking occurring at the motel.

30.

Prior to Plaintiff's sex trafficking at the Motel, Defendant and other Motel employees knew or should have known that rooms at the Motel were frequently used for short interactions of commercial sex with guests being trafficked at the motel.

31.

Prior to and during Plaintiff's trafficking at the Motel, the premises and its approaches were known for crime, prostitution, and sex trafficking, which is why Plaintiff's sex trafficker kept Plaintiff at the Motel to be sold for sex there.  In short, Defendant provided a busy market for just that type of illegal activity.

32.

Prior and in close proximity to Plaintiff's trafficking at the Motel, numerous witnesses observed obvious sex trafficking, prostitution, and other crimes occurring at the property:

**Witness Number 1**

33.

A witness named Janetta Fair who is familiar with the Motel has provided a witness declaration attached hereto as Exhibit 1.

34.

During 2013, Ms. Fair lived at the Motel for a couple of months while she was working at a nearby Waffle House. *See* Exhibit 1, ¶ 2.

35.

During the time that Ms. Fair stayed at the motel, she personally observed "girls being sold for sex at the property." Exhibit 1, ¶ 3.

36.

According to Ms. Fair, "[i]t was not hard to tell which girls were doing this – they were wearing high heels and short dresses or skirts and walking or standing outside at the motel waiting to meet men who would pay for sex." Exhibit 1, ¶ 4.

37.

Walking to or from work, Ms. Fair would "almost always see some sex or drug activity" and she would also see "condom wrappers on the ground at times." Exhibit 1, ¶ 5.

14

38.

Ms. Fair recalls that "[t]he motel was particularly busy with lots of sex and drug activity on the weekends." Exhibit 1, ¶ 6.

39.

"It was not hard to tell what sorts of activity was occurring" but Ms. Fair "never saw any security guards at the property, and management did not seem to care what occurred as long as the people were paying for the rooms." According to Ms. Fair, "management just turned a blind-eye." Exhibit 1, ¶ 7.

**Witness Number 2**

40.

A witness named Tomas Rojas, Jr. who is familiar with the Motel has provided a witness declaration attached hereto as Exhibit 2.

41.

Mr. Rojas was an employee at the Motel during the 2013 – 2017 time frame. Exhibit 2, ¶ 2.

42.

During his employment, Mr. Rojas "observed lots of prostitutes, ex felons, drug dealers and pimps." Exhibit 2, ¶ 3.

15

43.

Many of the prostitutes Mr. Rojas saw were regulars at the motel as were a lot of the drug dealers.  Exhibit 2, ¶ 4.

44.

When Mr. Rojas first began working at the motel, he worked night shift and would call law enforcement all the time. Exhibit 2, ¶ 5.

45.

Management eventually discouraged Mr. Rojas from calling law enforcement because Mr. Rojas was costing the motel revenue and management thought Mr. Rojas was being too strict.  Exhibit 2, ¶ 6.

46.

During Mr. Rojas' employment, there were always needles, pipes, drugs, and condoms in the parking lot, in the rooms, and elsewhere on the motel property. Exhibit 2, ¶ 13.

47.

On one occasion, a group of prostitutes came into the lobby accompanied by two males and began cursing at me saying that I was costing them money by calling the police. Exhibit 2, ¶ 15.

48.

The Motel rooms were not supposed to be rented for very quick stays, such as a couple of hours; however, to Mr. Rojas' knowledge, the Motel did rent rooms by the hour on a regular basis. Exhibit 2, ¶ 16.

**Witness Number 3**

49.

A witness named Ms. Nicole Leonard who is familiar with the Motel has provided a witness declaration attached hereto as Exhibit 3.

50.

Ms. Leonard stayed at the Motel for about a year or more in the 2015 – 2017 time period. Exhibit 3, ¶ 2.

51.

While staying at the motel, Ms. Leonard saw "girls who would constantly be going in and out of the rooms, where you could tell they were selling sex with men." Exhibit 3, ¶ 3.

52.

"There were pimps who controlled these girls and there were also lookouts on the corner of the motel to warn of potential law enforcement." Exhibit 3, ¶ 4.

53.

On one occasion, Ms. Leonard witnessed "a large black man beating on one of the young girls who was a victim being sold for sex at the motel." Exhibit 3, ¶ 7.

54.

The manager at the motel "was a creep and was overly friendly with the girls who were being sold for sex and would go around trying to kiss the girls on the cheek." Exhibit 3, ¶ 9.

55.

When people complained about noise or made other complaints, the staff would retaliate and usually kick them out. Exhibit 3, ¶ 12.

56.

The employees "absolutely did not care about the criminal activity, prostitution, or pimps, and in fact seemed to cater to the drug dealers and pimps." Exhibit 3, ¶ 13.

57.

According to Ms. Leonard, this was "a very bad motel with lots of crime, including young girls who were being sold for sex, and although it was obvious what was occurring, the motel did not care and would actually cater to and be friendly with the pimps and drug dealers." Exhibit 3, ¶ 15.

**Witness Number 4**

58.

A witness named Leebria Moore who is familiar with the Motel has signed a witness declaration that is attached hereto as Exhibit 4.

59.

Ms. Moore lived off and on at the Motel from 2015 - 2024. Exhibit 4, ¶ 2.

60.

According to Ms. Moore, "there was lots of prostitution, sex trafficking, and drug dealing at the Motel 6  When you entered the property, there would be pimps and prostitutes waiting outside the front office. You would see 2-3 pimps standing around and at the side window near the office would be 5-6 prostitutes.  They would be standing in front of the window near the office and you had to get by them to rent a room. The people inside the office saw those girls picking up guys and taking them into the rooms for sex."  Exhibit 4, ¶ 3.

61.

There were also lots of girls always in the back of the first building being sold for sex.  There would be other pimps and girls on the corners of the other building around the pool. Then there was another spot on the left side in between the two building that was busy. There were girls obviously being sold all around the hotel, standing out in the open, picking up dates.  Exhibit 4, ¶ 4.

19

62.

Ms. Moore saw that there "were always lots of girls handing outside trying to pick up dates, going from room to room, escorting men to their rooms. It was very disturbing. These girls looked broken down and some of them looked like they were as young as 14 or 15 years old." Exhibit 4, ¶ 5.

63.

There was also a man who stayed outside on a balcony and was the lookout to see who was pulling in and out of the parking lot and signaling to the pimps and the girls what was going on. Exhibit 4, ¶ 6.

64.

Ms. Moore often talked to the staff at the hotel about the prostitution and sex trafficking at the motel, but the motel never did anything to stop the girls being sold for sex.  Exhibit 4, ¶ 7.

**Witness Number 5**

65.

A witness named Clayton Corpus who is familiar with the Motel has signed a witness declaration that is attached hereto as Exhibit 5.

66.

Mr. Corpus stayed at the motel for about three months in 2011.  Exhibit 5, ¶ 2.

67.

Mr. Corpus saw girls hanging around the property coming in an out of the rooms with men who weren't staying at the hotel. They were dressed like prostitutes, wearing fish nets and mini dresses. Mr. Corpus saw them hanging around in the hotel and the office. There were pimps hanging out all around the hotel, loitering outside with the girls who were being sold for sex in the parking lot. Exhibit 5, ¶ 3

68.

Mr. Corpus observed that the drugs and sex "got really bad on the weekends." He would see "a lot of foot traffic going in and out of rooms." He would see "girls take buyers by the hand, go to a room, and stay for a little while." There was as many as 14 to 20 girls selling sex at the motel, especially on the weekends. Exhibit 5, ¶ 5.

69.

Mr. Corpus' sister was raped at the motel by the next door neighbor who broke into their room. Mr. Corpus came to believe that his sister was sold for sex at the motel by one of the people that worked at the front desk. Mr. Corpus asked the motel about the person who raped his sister and to call the policy. They would not help. They threatened to call the police on Mr. Corpus and his sister or to kick them out. Mr. Corpus' sister then committed suicide at the motel in 2011 the day after she was raped. Exhibit 5, ¶ 6.

**Witness Number 6**

70.

A witness named Phillip Boyce who is familiar with the Motel has signed a witness declaration that is attached hereto as Exhibit 6.

71.

Mr. Boyce lived at the Motel off and on between 2015 – 2024. Exhibit 6, ¶ 2.

72.

Mr. Boyce observed that there was lots of prostitution, sex trafficking, and drug dealing at the Motel 6. Exhibit 6, ¶ 3.

73.

The Motel actually charged Mr. Boyce and his wife more money to stay at the Motel because they had their kids living with them. Exhibit 6, ¶ 5.

74.

When Mr. Boyce complained about the pimps and prostitutes to the motel staff, he was told to shut up and go back to his room. According to Mr. Boyce, "[t]he hotel staff catered to pimps and prostitutes and acted like the prostitutes, pimps, and drug dealers were the guests they preferred over a family like ours with young kids." Exhibit 6, ¶ 7.

22

**Witness Number 7**

75.

A witness named Keith Leonard who is familiar with the Motel has signed a witness declaration that is attached hereto as Exhibit 7.

76.

Mr. Leonard stayed at the motel for about a year or more during the 2015-2017 time frame. Exhibit 7, ¶ 2.

77.

Mr. Leonard personally observed a Motel employee named "Matt" take money from a pimp and from drug dealers in exchange for Matt turning a blind eye.  Exhibit 7, ¶ 6.

78.

While staying at the motel, Mr. Leonard saw a lot girls who would be going into and out of the rooms with different men.  It was obvious they were selling sex with the men. Exhibit 7, ¶ 8.

79.

On one occasion, Mr. Leonard approached a male he knew to be a pimp and asked him how old "his girl" was, because she appeared very young and the motel was not a good place for a child to be.  This was the same individual that had paid Matt, the Motel employee, in cash. Exhibit 7, ¶ 10.

80.

While Mr. Leonard stayed at the motel, there were at least two shootings. In one of these instances, a young girl who owed money to an individual, believed to be her pimp, was shot through the door. Exhibit 7, ¶¶ 14-15.

## Defendant's Negligent Failure to Act

81.

Defendants and the other Motel employees knew or should have known that obvious sex trafficking, including Plaintiff's sex trafficking, was occurring every day at the Motel.

82.

Despite this knowledge, Defendants negligently and recklessly allowed the crimes perpetrated against Plaintiff and other sex trafficking victims to continue.

83.

Despite the dangerous, illegal, and criminal activity at the motel, Defendants negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

84.

Despite having actual or constructive knowledge of this illegal activity, Defendants negligently failed to take reasonable and necessary steps to stop such illegal and dangerous activities from occurring.

85.

Additionally, Defendants negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the motel.

86.

Defendants also negligently failed to provide proper training to their employees on what they were supposed to do if they saw or suspected that dangerous or illegal activity, prostitution, or sex trafficking was occurring at the motel.

87.

Defendants also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, on how the staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so that the motel could better deter or prevent crime in the future.

88.

Defendants also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at

the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

89.

Defendants knew or should have known that they were permitting the motel to be used as a place of prostitution and sex trafficking.

**Defendants' Knowledge of Sex Trafficking Generally**

90.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

91.

Defendants knew or should have known that during the relevant period Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at the Motel. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country.[2]  In 2007, Atlanta's sex trafficking economy

---

[2] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited May 21, 2026); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*,

was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant has received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiff and other victims.

92.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

93.

Defendants knew or should have known that the motel and the surrounding Fulton Industrial Boulevard area were known to be common and notorious locations for prostitution, sex crimes, and sex trafficking to occur.[5] That is why Plaintiff's

---

Urban Institute, (March 12, 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited May 21, 2026).

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited May 21, 2026).

[4] *Id.*

[5] *See, e.g.*, Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12, 2014) (Noting that "street-level prostitution . . . occurs along specific tracks within more densely urban areas, particularly the Fulton Industrial area."),

traffickers sold them there.

94.

Defendants knew or should have known that motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" City *of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

95.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that ninety-two percent of the calls it received involving motels and motels reported sex trafficking, and another two percent reported a combination of sex and labor trafficking.[6] And the Polaris Project found

---

123, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited May 21, 2026); Aaron Diamant, *Loophole Helps Cheap Hotels Serve as Save Havens for Violent Crime,* WSB-TV 2, (May 21, 2016) https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/. (Last visited May 21, 2026)

[6] *Human Trafficking and Hotels & Motels*, Polaris Project, https://polarisproject.org/human-trafficking-and-hotels-motels/ (last visited May 21, 2026).

that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with motels at some point during their exploitation . . . . Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from motel staff."

96.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[7]

97.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels can take:

    a.  establish corporate policy and procedures against sexual exploitation of children;

    b.  train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

    c.  include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

    d.  provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report

---

[7] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited May 21, 2026).

suspected cases;

e.  support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

f.  report annually on the company's implementation of Code-related activities.

98.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels the tools to address the scourge of sex trafficking at motels.

99.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and motels, such as:

a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b.  persons who lack freedom of movement or are constantly monitored;

c.  persons who have no control over or possession of money or ID;

d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g.  extended stay with few or no personal possessions in the room;

h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i.  the same person reserves multiple rooms;

j.  a room is rented hourly, less than a day, or for an atypical extended stay;

k.  attempts to sell items to or beg from patrons or staff;

l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

m.  loitering and solicitation of male patrons;

n.  waiting at a table or bar and picked up by a male (trafficker or customer);

o.  persons asking staff or patrons for food or money; and

p.  persons taking cash or receipts left on tables.

100.

Without a market, a place for the buying and selling of humans for sex, sex trafficking would cease to exist. Defendants, for a fee, provided that market, a private and anonymous market for Plaintiff to be sold for sex at its motel.

## COUNT I:

## STATUTORY LIABILITY: SEX TRAFFICKING 18 U.S.C. § 1595 and MASHA'S LAW, 18 U.S.C. § 2255

101.

Plaintiff incorporates the paragraphs above as if fully restated herein.

102.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

103.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Motel, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Motel, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

32

104.

Defendants participated in a Motel venture and knew or should have known that his operation of the Motel violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the Motel Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficker to harbor, falsely imprison, and traffic Plaintiff at the Motel.

105.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Motel. Defendants also participated in a venture by actively cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiff's sex trafficking to harbor, falsely imprison, and traffic Plaintiff at Defendants' Motel.

106.

The venture in which Defendants participated was in or affecting interstate commerce.

107.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiff's child sex trafficking at the Motel. Defendants knew or should have known of this participation.

33

108.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Motel.

109.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of his agents and representatives.

110.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

111.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

112.

Defendants are liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

113.

Plaintiff was under the age of 18 when she was trafficked at the Motel.

114.

Plaintiff was a victim of violations of 18 U.S.C. § 1591 at the Motel.

115.

As described herein, Defendants knowingly benefitting from participating in a venture that he knew or should have known engaged in an act of sex trafficking at the Motel, including the harboring and other trafficking activities which harmed Plaintiff.

116.

Plaintiff suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255, and Defendants face liability under such statutes.

117.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiff for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT II**
**NUISANCE**

118.

Plaintiff incorporates the paragraphs above as if fully restated herein.

119.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

120.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

121.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

122.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building,

structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

## Public Nuisance

123.

The Motel's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

124.

The Motel caused or contributed to a blighting effect on the surrounding community, so that the Motel negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Motel, although the effects on each person may have varied.

125.

The illegal prostitution and sex trafficking nuisance occurring at the Motel had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

126.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Motel caused special damages to Plaintiff, as she was the victims of child sex trafficking at Defendants' nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

### Public Nuisance Per Se

#### 127.

The Motel constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Motel including sex trafficking.

#### 128.

A business where illegal practices are permitted constitutes a nuisance.

#### 129.

A business, like the Motel, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

#### 130.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Motel that permitted illegal sexual activity to occur there.

#### 131.

Defendants are liable for nuisance (public nuisance and/or per se public nuisance) by reason of his failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## DAMAGES

### 132.

Plaintiff incorporates the paragraphs above as if fully restated herein.

### 133.

As a proximate and foreseeable result of Defendants' violations of the TVPRA, Masha's Law, and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a. Personal injuries;

b. Past, present and future conscious pain and suffering;

c. Loss of enjoyment of life;

d. Mental anguish and emotional distress;

e. Incidental expenses;

f. All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g. Consequential damages to be proven at trial.

134.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

135.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all

expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

    a. Process issue as provided by law;

    b. Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

    c. Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

    d. Plaintiff be awarded a trial by jury; and

    e. Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 28th day of May, 2026.

**ANDERSEN, TATE & CARR, P.C.**

/s/ *Tyler Dillard*
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com

41

Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
Attorneys for Plaintiff

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680